Case 4:96-cv-00382  Document 19  Filed on 01/22/97 in TXSD  Page 1 of 30

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

**JAN 23 1997**

Michael N. Milby, Clerk

| | | |
|---|---|---|
| EXXON CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO.H-96-0382 |
| | § | |
| EXXON EMPLOYEES' FEDERATION | § | |
| OF TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before this court are cross-motions for summary judgment filed by plaintiff Exxon Corporation ("Exxon") and defendant Exxon Employees' Federation of Texas ("Federation"), and a motion for partial dismissal filed by Federation. After a careful review of the motions, the record, and the applicable law, this court GRANTS Federation's motion to dismiss Sections VIII, IX and X of its counterclaim; DENIES Exxon's motion for summary judgment vacating the arbitration award; and GRANTS the Federation's cross-motion for summary judgment confirming the award, for the reasons stated below.

## I.    Background

The relevant facts of this case are undisputed.  (*See* Docket Entry Nos. 10 and 16).  Exxon stores and distributes motor fuel products, oil, and lubricants in Texas.  On September 2, 1985, Exxon hired Joseph F. Nugent ("Nugent") as a delivery salesman, or truck driver.  (Docket Entry No. 11, pp. 137, 392).  Nugent drove a tractor-trailer combination from Exxon terminals across Texas public highways to service stations.  Each load consisted of 9,000 gallons of motor fuel.

Nugent was a member and president of the Federation, the union chapter representing Exxon employees in Texas.  The Federation and Exxon are signatories to a collective bargaining agreement (the "Agreement").  (Docket Entry No. 11, p. 36).  The Agreement provides for final and binding arbitration of employee grievances.  (Agreement, Article XIV).

The Agreement authorizes Exxon to discharge its employees without prior notice for the commission of defined Posted Offenses.  (Agreement, Article XV § 1).[1]  Included in the Posted Offenses are the following:

> Posted Offense 2B.  Dishonesty.  Making a written or oral statement to the Company [Exxon], which one knows to be untrue.

---

[1]     Article XV, § 1 of the Agreement provides that: "[t]he Company [Exxon] may discipline and discharge employees for just cause and may, from time to time, post a list of offenses which it deems serious. The commission of any Posted Offense will be just cause for discharge without prior notice at the discretion of the Company. . . [T]he Company may make additions, deletions or changes to these Posted Offenses at its discretion.  The Federation will be notified by mail of any such changes (which will also be posted on the bulletin board) prior to the effective date of such additions, deletions, or changes." (Docket Entry No. 11, Ex. B).

Posted Offense 4E. Neglect of Duty. Failure to comply with federal, state or local environmental safety or penal laws, regulations, rules, or ordinances.

Posted Offense 6. Alcohol Beverage/Habit-Forming or Illegal Drug or Any Dangerous Substances.

> A. Being under the influence of an alcoholic beverage or drug on Company time or property. Testing positive on a drug test or refusal to submit to a drug test.

> B. Bringing onto Company property, or possessing, or using on Company time or Company property, an alcoholic beverage, illicit or unprescribed controlled substance, or any dangerous substance which the Company believes may impair the employee's ability to properly perform duties in a safe and responsible manner.

> C. Habitual use of an alcoholic beverage or a drug substance.

(Docket Entry No. 11, pp. 98-100).

In addition, Exxon had in effect a Drug and Alcohol Policy. The Drug and Alcohol Policy states in relevant part that:

> Exxon Corporation is committed to a safe, healthy, and productive workplace for all employees. The Corporation recognizes that alcohol, drug, or other substance abuse by employees will impair their ability to perform properly and will have serious adverse effects on the safety, efficiency, and productivity of other employees and the Corporation as a whole. The misuse of legitimate drugs or the use, possession, distribution, or sale of illicit or unprescribed controlled drugs on company business or premises is strictly prohibited and is grounds for termination. . . . Being unfit for work because of use of drugs or alcohol is strictly prohibited and is grounds for termination of employment. . . .

> Exxon may conduct unannounced searches for drugs and alcohol on owned or controlled property. . . . Unannounced periodic or random testing will be conducted when an employee meets any one of the following conditions: . . . is working in a designated position identified by management, a position where testing is required by law. . . .

(Docket Entry No. 11, p. 130).

The Alcohol and Drug Policy requires employees to inform their supervisors immediately in writing if they "receive a traffic ticket for an alcohol and drug-related traffic violation; or are arrested for any incident involving public intoxication. . . ." (Docket Entry No. 11, Ex. B, p. 129). In November 1989, when the policy was adopted, Nugent signed a statement of compliance, in which he acknowledged his understanding that "the Company relies upon me to accurately and completely inform my supervisor of any and all substance abuse related incidents. Further, I understand that if I fail to inform my supervisor as described above (including disposition of reported traffic tickets or arrests), I am subject to discipline up to and including termination." (*Id.*).

On June 12, 1994, while off-duty and driving his personal vehicle, Nugent was arrested for driving while intoxicated ("DWI"). On December 1, 1994, in a case styled *State of Texas v. Joseph F. Nugent*, No. 9423946, in the County Criminal Court at Law Number 14 of Harris County, Texas, a jury found

Nugent guilty of the DWI offense. (Docket Entry No. 11, p. 123).[2] Nugent was fined $350 and sentenced to one year in the Harris County jail; his sentence was probated for two years. (Docket Entry No. 11, p. 123). Nugent immediately appealed the conviction. The Court of Appeals for the First District of Texas upheld the conviction on June 6, 1996. (Docket Entry No. 11, Ex. D, p. 488).

Nugent did not report the arrest, conviction, or appeal to Exxon. On December 31, 1994, while the appeal was pending, Nugent reported and "certified" on his Commercial Driver's Certification that he had not been "convicted [of any traffic violation (other than parking)] or forfeited either bond or collateral on account of any such violation during the past twelve months." (Docket No. 11, p. 114). By signing the form, Nugent also certified that he "underst[ood] that any falsification of information on the [commercial driver's certification] form [was] grounds for dismissal." (*Id.*).

On February 16, 1995, Equifax, a company which routinely checked the driving records of Exxon's Houston drivers, reported to Exxon that Nugent had been convicted for "driving while intoxicated in Harris County" and "probated." (Docket Entry No. 11, p. 115). On the same date, Walter Clay

---

[2]     "Officer Persails, the arresting officer, testified he saw [Nugent's] vehicle swerve violently, and the cars directly behind the appellant were holding back. Officer Persails stopped [Nugent] and asked to see his driver's license. [Nugent] looked in his wallet and passed over his license several times and could not identify it. Officer Persails asked [Nugent] to step out of his truck, and [Nugent] fell face down in the parking lot. Officer Persails smelled a strong odor of alcohol on [Nugent]. About 25 minutes after the stop, [Nugent] was videotaped performing sobriety tests back at the police station. The video was admitted into evidence and viewed by the jury. . . [T]he trial judge remarked during the punishment phase that this was the worst video he had seen during his eight years on the bench." (Docket Entry No. 11, Ex. D, pp. 496-97).

("Clay"), Nugent's supervisor, asked Nugent about the Equifax report. The precise exchange between Nugent and Clay was the subject of disputed testimony at the arbitration hearing. However, it is undisputed that Nugent denied that the Equifax report was correct, saying that there must have been some "mistake." (Docket Entry No. 131). Nugent promptly investigated and learned from the State of Texas that his conviction was indeed on his driving record. Nugent quickly called Clay and admitted to the DWI, stating: "I guess you caught me red-handed with my hand in the cookie jar." (Docket Entry No. 11, p. 301). Nugent explained that he believed the DWI was not supposed to appear on his driving record because of the appeal.

On February 28, 1995, Exxon discharged Nugent for violating the company's Drug and Alcohol Policy by failing to report his arrest and conviction; for committing Posted Offense 4E by failing to report his conviction to Exxon as required by DOT regulations; and for committing Posted Offense 2B by failing to list his conviction on the Commercial Driver's Certification form and by making a false statement during Exxon's investigation of the Equifax driving record report. (Docket Entry No. 11, p. 119).[3] The Federation filed a grievance on Nugent's

---

[3]     In a letter to Nugent, dated February 28, 1995, Exxon stated that:

[y]our [Nugent's] employment with Exxon . . . is terminated effective March 1, 1995. The investigation of your arrest and conviction of a DWI in 1994 revealed: 1. You violated the Company's Drug and Alcohol Policy by failing to report your arrest and subsequent conviction; 2. [y]ou violated Posted Offense 4E by failing to report your conviction to Exxon as required by DoT regulations; and 3. [y]ou violated Posted Offense 2B by failing to list your conviction on the Commercial Driver's Certification form and by making false statements to the Company in its investigation of the contents of the

behalf.[4]  On April 7, 1995, Exxon denied the grievance on the grounds that Exxon
"believe[d] that Mr. Nugent was discharged for just cause . . . and d[id] not find
that [Nugent] was justified in not reporting his DWI conviction."  (Docket Entry
No. 11, p. 110).  Under the Agreement, the Exxon-Federation dispute was sent
to arbitration.

On January 8, 1996, the arbitrator issued his decision.  The arbitrator
found that Nugent had not violated either Posted Offense 2B or 4E.  The arbitrator
found that, during his first conversation with Clay, Nugent "genuinely believed,
based on expert legal advice, that he was not guilty of a 'conviction' until his legal
appeal was finalized."  (Docket Entry No. 11, p. 30).  Although Nugent
intentionally misled Exxon with his omission, he chose "his words carefully to
avoid a false statement."  (Docket Entry No. 11, p. 31).  The arbitrator noted that
"even [Exxon] witness [Robert] Spath, a labor relations specialist, honestly
agree[d] that omission of information does not constitute a [Posted Offense] 2B."
(Docket Entry No. 11, p. 31).  The arbitrator concluded that:

> Equifax driving record report.  Each one of these violations was considered
> appropriate grounds for termination.

(Docket Entry No. 11, p. 119).

[4]      The grievance stated in pertinent part that: "[Exxon] has discharged . . . Nugent without just
cause in violation of Article XV of the Agreement between Exxon and the Federation.  Furthermore the
provisions of the Drug and Alcohol Policy cited by the Company are void and unenforceable. . . Nugent did not
violate Posted Offense 4E because under the law of the State of Texas he has not been convicted of DWI in
1994 as alleged, thus there was no conviction to report. . . Nugent did not violate Posted Offense 2B because he
has made no false oral statements to [Exxon]. . . [Exxon's] discharge of . . . Nugent is in retaliation for his
activities as Federation President, in violation of Articles I and XXIII of the Agreement."  (Docket Entry No.
11, p. 118).

> [i]n the final analysis, if Nugent did not intentionally make an untrue statement, either verbally or in written form, to the Company regarding the DWI verdict . . ., then it is not difficult to conclude that Nugent did not violate either of the posted offenses (at least not deliberately and knowingly).

(Docket Entry No. 11, p. 31).

The arbitrator also found, however, that Nugent was not "without sin," noting that Nugent "should have reported his arrest under the [Drug and Alcohol] Policy." (Docket Entry No. 11, p. 32). Such a violation gave Exxon the authority to discipline or discharge Nugent for "just cause," with notice. (Article XV). The arbitrator rejected Nugent's argument that an arbitration in a different case, relating to Exxon's Drug and Alcohol Policy, removed Nugent's obligation to report his DWI arrest under the Policy. However, the arbitrator found that "just cause" considerations argued in favor of requiring Exxon to reinstate Nugent, with the discretion to reinstate him to a nondriving job. The arbitrator found that Nugent had quickly "recanted" his deception and was thereafter cooperative and honest with management; Nugent's DWI arrest occurred off-duty on a non-work day; he had no prior disciplinary infractions for dishonesty; he had been a good employee for nine and one-half years; he had been subjected to random drug testing and had always tested negative; and Exxon witnesses testified that they had no reason to suspect that he had ever been at work while under the influence of drugs or alcohol. The arbitrator also found that, if

Nugent had reported the DWI, he would not have been terminated but reassigned to a nondriving job. (Docket Entry No. 11, Ex. A, p. 33).

The arbitrator concluded that "Nugent deserve[d] reinstatement . . . but with a penalty." (Docket Entry No. 11, pp. 32-34). The arbitrator awarded Nugent reinstatement but gave Exxon "the discretion to reinstate Nugent in a non-driving job." (Docket Entry No. 11, pp. 32-34).

On February 5, 1996, Exxon filed suit in this court to vacate the arbitration award. (Docket Entry No. 1). On March 11, 1996, the Federation counterclaimed, seeking enforcement of the arbitration award. (Docket Entry No. 3, p. 3). On September 16, 1996, Federation moved to dismiss its counterclaim which had sought to vacate the portion of the award granting Exxon discretion to reinstate Nugent in a non-driving job. (Docket Entry No. 14). The parties now cross-move for summary judgment.

## II.    Federation's Motion for Partial Dismissal

Federation seeks to dismiss, with prejudice, Sections VIII, IX, and X of its counterclaim. By this motion, Federation abandons its efforts to vacate the portion of the arbitrator's award granting Exxon the discretion to place Nugent in a non-driving job upon reinstatement. (Docket Entry No. 14). Exxon did not respond to the motion. This court GRANTS Federation's motion for leave to dismiss and DISMISSES with prejudice Sections VIII, IX, and X of Federation's counterclaim.

## III.  The Applicable Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Under FED. R. CIV. P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial." *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986); *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bear[s] the burden of proof." *Little*, 37 F.3d at 1075; *citing Celotex*, 106 S. Ct. at 2552.

### B.  The Review of Arbitration Awards

9 U.S.C. § 10 provides in pertinent part that:

(a) [i]n any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

. . .

9 U.S.C. § 10. In addition, 9 U.S.C. § 11 provides in part that:

[i]n either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration--

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
>
> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. § 11.

Federal court review of arbitration awards is deferential. *Gulf Coast Industrial Workers Union v. Exxon Co., U.S.A.*, 991 F.2d 244, 248 (5th Cir.), *cert. denied*, 114 S. Ct. 441 (1993). "In determining whether the arbitration panel exceeded its jurisdiction, we resolve all doubts in favor of arbitration." *Dole Ocean Liner Exp. v. Georgia Vegetable Co.*, 84 F.3d 772, 774 (5th Cir. 1996); *citing Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210, 213 (5th Cir.), *cert. denied*, 509 U.S. 923 (1993). Courts review arbitration awards to determine whether the award "stem[s] from fraud or partiality; . . . concerns a matter not subject to arbitration under the contract; . . . does not draw its essence from the contract; . . . or violates public policy." *Manville Forest Products Corp. v. United Paperworks International*, 831 F.2d 74 (5th Cir. 1987), *cited in Gulf Coast*, 991 F.2d at 248.

## IV. An Award That "Draws Its Essence from the Contract"

Exxon argues that the arbitration award should be vacated because the arbitrator exceeded his authority[5] in "add[ing] a knowledge and intent

---

[5] Exxon alleges that the arbitrator violated Article XIV Section 3 of the collective bargaining agreement, which provides that the arbitrator "shall have no authority to add to, detract from, alter, amend or modify any provision of this agreement. . . ." (Docket Entry No. 11, p. 85).

requirement" to Posted Offense 4E." (Docket Entry No. 10, pp. 18-21). Posted Offense 4E is defined as a "failure to comply with federal, state or local environmental safety or penal laws, regulations, rules, or ordinances." (Docket Entry No. 11, p. 99).

An arbitration award may be vacated if the arbitrator exceeded his authority and fashioned an award that did not "draw its essence" from the collective bargaining agreement. *United Steel Workers of America v. Enterprise Wheel & Car Corp.*, 80 S. Ct. 1358, 1361 (1960). The Supreme Court has stated that:

> an arbitrator is confined to interpretation and application of the Collective Bargaining Agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the Collective Bargaining Agreement. When the arbitrator's words manifest his infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*United Steel Workers of America*, 80 S. Ct. at 1361; *see also Exxon Corp. v. Baton Rouge Oil and Chemical Workers Union*, 77 F.3d 850 (5th Cir. 1996) ("[a] court will not disturb an award if it draws its essence from the collective bargaining agreement and is not based on the arbitrator's own brand of industrial justice").

An arbitrator does not exceed his authority, and an award does not fail to draw its essence from the collective bargaining agreement, simply because the

award rests on the arbitrator's misinterpretation of the collective bargaining agreement. *United Paperworks International Union, AFL-CIO v. Misco, Inc.*, 108 S. Ct. 364, 370-71 (1987). "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. . . . Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator. . . ." *Misco*, 108 S. Ct. at 370-71; *see also Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993).

A court may not overturn an award simply because the court believes its own interpretation of the collective bargaining agreement is the better one. *W.R. Grace & Co. v. International Union of Rubber Workers*, 103 S. Ct. 2177, 2183 (1983); *see also Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co.*, 918 F.2d 1215, 1218 (5th Cir. 1990), *cert. denied*, 111 S. Ct. 2799 (1991). "[T]he parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. . . . [A]s long as the arbitrator is even arguably construing or applying the contract . . ., that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 108 S. Ct. at 371.

In this case, the arbitrator interpreted the collective bargaining agreement and Posted Offense 4E to include a "deliberate and knowing" requirement.    Exxon argues that because Posted Offense 4E is "unambiguous . . . [and] contains no element of knowledge, intent, or bad faith," the arbitrator erred in finding that Nugent had not violated Posted Offense 4E because he honestly, if mistakenly, believed he had not been finally convicted, and therefore did not deliberately and knowingly fail to report his conviction.  (Docket Entry No. 17, p. 8).  However, interpretation of the collective bargaining agreement and its posted offenses was "the very thing the arbitrator was hired to do."  *United Food and Commercial Workers v. National Tea Co.*, 899 F.2d 386, 388 (5th Cir. 1990); *see also Misco*, 108 S. Ct. at 370.

"The court[] ha[s] no business . . . determining whether there is particular language in the written instrument which will support the claim." *Misco*, 108 S. Ct. at 370; *citing Steelworkers v. American Manufacturing Co.*, 80 S. Ct. 1343, 1346 (1960).  This court will not impose its own, different, interpretation of the contract nor review the correctness of the arbitrator's interpretation. *See Misco*, 108 S. Ct. at 370-71; *see also National Tea*, 899 F.2d at 388.  An interpretation of Posted Offense 4E to find an employee not guilty of failing to report a conviction because he honestly, but mistakenly, believed he had not been finally convicted, is an interpretation that appears rationally inferable

from the collective bargaining agreement. The award "draws its essence" from the Agreement.

Exxon argues that because a good faith exception does not explicitly appear in Posted Offense 4E, the arbitrator "unquestionably modified the terms of the collective bargaining agreement, in derogation of his authority. . . . This arbitrator has in effect amended Posted Offense 4E. . . . That is rewriting the contract. . . ." (Docket Entry No. 17, p. 7; No. 10, p. 19). The asserted misinterpretation of the contractual provision in this case does not differ from other "misinterpretations" of collective bargaining agreements that courts have upheld under the required deferential standard of review. *See, e.g., Interstate Brands Corporation Butternut Bread Division v. Chauffeurs, et al.*, 909 F.2d 885, 891-92 (6th Cir. 1990) (despite provisions in the collective bargaining agreement which deprived the arbitrator of the authority to "add to, subtract from or in any way modify" the terms of the agreement, and which required employees to "file a grievance within fifteen days of its occurrence or the parties' awareness thereof," the court upheld an arbitration award allowing a suspended employee to file a grievance after fifteen days had passed by interpreting the suspension as "a 'continuing act' or 'occurrence' which could be grieved at any time"), *cert. denied*, 111 S. Ct. 1104 (1991); *see also Folger Coffee Co. v. International Union, U.A.W., Local 1805*, 905 F.2d 108, 109-112 (5th Cir. 1990) (despite provisions in the agreement which prohibited an arbitration from amending the

agreement and which reserved to the company "the determination of the nature and extent of work, if any to be contracted or transferred out," the court upheld an arbitration award interpreting the contracting provision in light of the parties' past practices and principles of good faith; the court stated that "the strong lesson of *Misco*" is that even though arbitrators arguably misunderstand the language of agreements, courts may not vacate the arbitrators' determination); *see also Bruce Harwood Floors v. Southern Council of Industrial Workers*, 8 F.3d 1104, 1106-08 (6th Cir. 1993) (although the collective bargaining agreement listed sleeping on duty as conduct for which an employee could be discharged immediately, the arbitrator did not exceed the scope of the agreement by requiring the employer to consider such mitigating factors as the employee's record, the degree of the offense, and the degree of intent to commit the offense, before discharging an employee for sleeping on duty); *see also Super Tire Engineering Co. v. Teamsters Local Union No. 676*, 721 F.2d 121, 124 (3d Cir. 1983) (the court found that the arbitrator was free to read an "immediate discharge" clause in light of a preceding clause that provided for discussions between management and the union before discharge could occur), *cert. denied*, 105 S. Ct. 83 (1984).

These cases reflect courts' concern that virtually any alleged misinterpretation of a contract can be said to modify the contract by adding or deleting an element of the contract as written. If every contract misinterpretation is an unauthorized modification, then the deferential standard of review accorded

arbitration awards becomes meaningless; a court could reinterpret every collective bargaining agreement and vacate every award with which it disagreed on the basis of a "modification" of the agreement.  "If the courts were free to intervene on these grounds, the speedy resolution of grievances would be greatly undermined." *Misco*, 108 S. Ct. at 371.

Exxon also argues that the arbitrator "impermissibly altered and modified" Department of Transportation ("DOT") regulations by interpreting "th[e] regulations to carry a deliberate and knowing requirement" when no such requirement appeared in the regulations.[6]  (Docket Entry No. 10, p. 21).  An arbitrator's interpretation of state and federal regulations, unlike his interpretation of a collective bargaining agreement, is not entitled to deferential review by the courts. *Interstate Brands Corp. v. Local 441 Retail, Wholesale Department Store Union*, 39 F.3d 1159, 1162-64 (11th Cir. 1994).  In *Interstate Brands*, the court found that the arbitrator incorrectly interpreted DOT regulations regarding the "chain of custody" of drug test samples, and vacated the arbitration award.  *Id.* In this case, however, unlike *Interstate Brands*, the arbitrator did not interpret the

---

[6]     Regulations promulgated by the Department of Transportation ("DOT") require individuals possessing a commercial driver's license to report convictions for violations of state or local laws relating to motor traffic control to their employer, within thirty days of the conviction.  49 C.F.R. §§ 383.31(b) and 391.27(b) (1994), *cited in* Docket Entry No. 10, pp. 18-19.  The Department of Transportation defines "conviction" as follows: "[c]onviction means an unvacated adjudication of guilt, or a determination that a person has violated or failed to comply with the law in a court of original jurisdiction . . . regardless of whether or not the penalty is rebated, suspended, or probated."  49 C.F.R. § 383.5 and 390.5 (1994).  Exxon included in its filings, "an official interpretation of th[ese] regulation[s] by James Scapellato, the Director of Office of Motor Carrier Standards, U.S. Department of Transportation, which unambiguously states that the taking of an appeal does not vacate or annul the conviction, nor does it stay the notification requirements of § 383.31."  (Docket Entry No. 10, p. 20, internal quotations omitted).  This court does not address Scapellato's argument or the DOT regulations noted by Exxon because it is not relevant to the determination of this case.

DOT regulations in making his award. The arbitrator expressly declined to interpret the regulations, stating: "[t]he undersigned will not even attempt to argue the merits of . . . the DOT's advisory opinion. . . ." (Docket Entry No. 11, p. 30). Instead, the arbitrator based his award on an interpretation of the Posted Offenses in the collective bargaining agreement. (Docket Entry No. 11, p. 31). If the arbitrator did incorrectly find a deliberate and knowing requirement to the failure to report offense, he did so in the Agreement and not the DOT regulations. The arbitrator did not incorrectly apply the DOT regulations; he did not apply the DOT regulations at all.

Exxon's motion to vacate the arbitration award on the ground that the award does not draw its essence from the Exxon-Federation collective bargaining agreement is DENIED.

## V.    A "Well Defined and Dominant" Public Policy

Exxon argues that the arbitration "award violates public policy by ordering reinstatement and backpay to a fuel truck driver who had been convicted of DWI and failed to report the conviction as required by federal regulations and Company policy." (Docket Entry No. 10, p. 8).

An arbitration award is subject to challenge on the ground that it violates public policy. *Misco*, 108 S. Ct. 364. Courts are the ultimate arbiters of public policy; questions of public policy are "wholly independent" from the collective bargaining agreement. *Gulf Coast*, 991 F.2d at 248-49; *citing W.R.*

*Grace & Co.*, 103 S. Ct. at 2183.  A court may vacate an arbitration award "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy." *Baton Rouge*, 77 F.3d at 853; *see also Exxon Seamen's Union*, 993 F.2d at 360.

"Such a public policy, however, must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest."  *W.R. Grace*, 103 S. Ct. at 2183-84 (internal citations omitted), *quoted in Baton Rouge*, 77 F.3d at 853.  To vacate an award based on public policy, a court must "ground its decision upon an articulated review of laws and legal precedents that frown upon the reinstatement of such employees."  *Gulf Coast*, 991 F.2d at 250.  The court must specifically identify the existing laws and legal precedents underlying its decision and may not adopt "a common sense public policy approach, . . . [or] imprecise notions of public policy which would allow ill-defined considerations to negate the rule favoring judicial deference."  *Gulf Coast*, 991 F.2d at 249; *Misco*, 108 S. Ct. 364.

Exxon argues that Nugent's reinstatement violates a well-defined public policy against drug use, particularly in the work place.  Exxon points to federal and state regulations, and statutes that express such a policy, including federal motor carrier safety regulations, the Drug-Free Workplace Act, the American with Disabilities Act, and the Occupational Safety and Health Act.  (Docket Entry No. 10, pp. 8-17).  Exxon also cites cases in which courts have

found that the reinstatement of substance abusers to driving positions violates

public policy. (*Id.*). In *Amalgamated Meat Cutters v. Great Western Food Co.*,

the court stated that:

> [i]n a nation where motorists practically live on the highways, no citation of authority is required to establish that an arbitration award ordering a company to reinstate an over-the-road truck driver caught drinking liquor on duty violates public policy. Alcohol impairs a person's coordination, and inhibits his ability to reason rationally. Ingestion of alcohol slows the reflexes. It induces drowsiness. It slows response time to external stimuli. It dulls the senses. In recognition of alcohol's undisputedly debilitating characteristics, every state in the union prohibits driving while under its influence. A driver who imbibes the spirits endangers not only his own life, but the health and safety of all other drivers. These considerations are convincing enough with respect to drivers of automobiles. They become even more compelling when the driver is regularly employed to course the highways in a massive tractor-trailer rig.

712 F.2d 122, 124 (5th Cir. 1983). In *Gulf Coast*, in finding that an arbitration

award reinstating an employee after he tested positive for cocaine violated public

policy, the court noted "the emphatic national desire to eradicate illicit drugs from

the workplace," and "highlight[ed] the various legal sources reflecting our nation's

'well defined and dominant' desire for a drug-free society." *Id.* at 250.

A violation of Exxon's Drug and Alcohol Policy can justify an

employee's discipline, including discharge for "just cause." (Docket Entry No.

11, p. 130). Exxon's Drug and Alcohol Policy prohibits "the misuse of legitimate

drugs, . . . the use . . . of illicit or unprescribed controlled drugs on company

business or premises[,] . . . [b]eing unfit for work because of use of drugs or alcohol. . . ." (Docket Entry No. 11, p. 130). An employee's commission of an alcohol and drug-related posted offense can justify the employee's discharge without notice. Posted Offenses 6A, 6B, and 6C include the following: using or being under the influence of alcohol on company time or property, testing positive on a drug test, and habitually using alcohol. (Posted Offenses 6A-C; Docket Entry No. 11, p. 100). Nugent did not violate any of these Posted Offenses. (*Id.*). The arbitrator found, and Exxon admitted, that Nugent was convicted for driving while intoxicated while off-duty, on a non-work day, driving his personal vehicle; that Nugent was never suspected of being intoxicated while on the job; that he did not have an ongoing alcohol problem; and that he had tested negative on every random drug test. (Docket Entry No. 11, p. 33). Exxon did not discharge Nugent for his off-duty driving while intoxicated, but rather for his failure to report his arrest and conviction. During the arbitration hearing, Exxon witnesses testified that, had Nugent reported his DWI, Exxon would not have discharged Nugent; instead, Exxon would have reassigned Nugent to a nondriving job. (Docket Entry No. 11, p. 33). That is precisely what the arbitrator ordered. (Docket Entry No. 11, Ex. A).

The public policy at issue in this case is not the reinstatement of an employee discharged for driving while intoxicated, to a job as a truck driver, but the reinstatement of an employee, to a nondriving job, after a discharge for failing

to report an arrest and conviction. The cases cited by Exxon are not directly on point because, in those cases, the employees were discharged specifically because they tested positive for drug use, not because they failed to report an arrest or conviction for substance abuse. *See, e.g., Gulf Coast*, 991 F.2d 244.

In *Gulf Coast*, the employee, Thomas Woods ("Woods"), was an Exxon process technician, who worked in a safety-sensitive position with "volatile gases and liquids." 991 F.2d at 245. Unlike Nugent, Woods was dependent on both drugs and alcohol, had participated in an alcohol rehabilitation program, and two months later, tested positive for cocaine while at work.[7] *Gulf Coast*, 991 F.2d at 247. Exxon discharged Woods for violating Exxon's Alcohol and Drug Use Policy and breaching the drug after-care agreement. *Id.* The court "view[ed] as of the utmost importance . . . the fact that Woods tested positive for a drug as critical and powerful as cocaine when he had already been through rehabilitation and was in a sense on probation." *Gulf Coast*, 991 F.2d at 254. Given the facts of that case, the court concluded that reinstating Woods to the same safety-sensitive position and giving him "another chance . . . [was] extremely risky under these unusual and uncommon circumstances." *Id.*[8]

---

[7] Although Woods may not have used cocaine on company premises, the drugs were in his system at work because he tested positive for cocaine while on the job. *Gulf Coast*, 991 F.2d at 254.

[8] Exxon relies heavily on *Gulf Coast*, 991 F.2d 244. However, the present case is distinguishable from *Gulf Coast* because Nugent was not a habitual user of alcohol; had committed no alcohol-related offense in the past or been suspected of such; had not used a controlled substance on the job; had not been discharged for his alcohol use but for his failure to report his arrest and conviction; was found not to have actively concealed his crime but rather to have misunderstood his reporting duties; and had not been reinstated to his previous safety-sensitive position. The circumstances in Nugent's case are not as "unusual and uncommon" as in *Gulf Coast*. *Compare Gulf Coast*, 991 F.2d at 254; *see also Gulf Coast Industrial Workers v.*

In *Exxon Seamen's Union*, an employee helmsman tested positive for marijuana after running aground a 635-foot oil tanker. 993 F.2d at 358. Exxon discharged the employee for violating its drug policy. *Id*. The provisions relied on by the company in *Exxon Seamen's Union*, different from the ones relied on in this case, provided that:

> ¶ 1. Use, possession, distribution or sale of illicit or unprescribed drugs on Company business or premises is strictly prohibited and is grounds for termination.

> ¶ 4. The Company also has a right to require employees to submit to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug misuse. A positive test result or refusal to submit to a drug test is grounds for disciplinary action, including dismissal.

*Id*. at 359. The arbitrators ordered the employee's reinstatement, finding that the employee may not have used marijuana at work. *Id*. The district court vacated the arbitration award. *Id*. The Third Circuit affirmed, noting that, although the employee may have used the marijuana off-duty, he tested positive for marijuana and had the drug in his system while on-duty, an indication that he was "operating [the] vessel[] with impaired faculties." *Id*. at 361. The court concluded that "a

---

*Exxon Chemical Americas*, 863 F. Supp. 423, 429 (S.D. Tex. 1994) (the court distinguished the case before it in which an employee was discharged for coming in to work with a 0.043% blood alcohol level, from *Gulf Coast* by noting that: "[t]he employee in that case had an ongoing addiction to cocaine; he had been through rehabilitation; he had actively tried to conceal his relapse into drug use; and, importantly, he was reinstated to a safety-sensitive position. . . . By contrast, there is no evidence that Mr. Paull's [the employee in the case before it] intoxication was anything more than an isolated incident, and he was reinstated to a non-safety position"), *aff'd*, 53 F.3d 1281 (5th Cir.), *cert. denied*, 116 S. Ct. 180 (1995).

well-defined and dominant public policy against the operation of a vessel under the influence of drugs or alcohol" justified the employee's discharge. *Id.* at 362.

In *Baton Rouge*, an employee in a "highly [safety-]sensitive" position in an Exxon chemical plant tested positive for cocaine. 77 F.3d at 852. Exxon discharged the employee for violating its Drug and Alcohol Policy, but did not set out the precise nature of the violation. *Id.* The arbitrator ordered Exxon to give the employee backpay, even though reinstatement was not available because the employee was incarcerated for having sold drugs. *Id.* at 853. The arbitrator noted that "there was no evidence that [the employee] had brought drugs on company property or possessed or used drugs on company time, or habitually used a habit-forming drug." *Id.* The district court enforced the award, but the Fifth Circuit reversed and remanded, finding that the award violated public policy. *Id.* at 857. In its opinion, the court emphasized that: "[i]t is undisputed that [the employee] occupied a safety-sensitive position. It is also undisputed that [the employee] tested positive for cocaine while occupying that position, and thereby endangered the safety of other employees." *Id.* at 856. The court relied on the "presence of drugs in the workplace," evidenced by the fact that the employee tested positive while at work, in a safety-sensitive position. *Id.* at 856-57.

Nugent's case is distinguishable from the cases cited by Exxon because, unlike the employees in *Gulf Coast*, *Exxon Seamen's Union*, and *Baton Rouge*, Nugent did not test positive for alcohol or drugs while on the job; did not

use alcohol or drugs on the job; was not, and has never been, suspected of being under the influence of alcohol or drugs on the job; was discharged for a violation of Exxon's reporting rules, not for his use of alcohol or drugs; and was not required to be reinstated to a driving job. *Cf. Interstate Brands Corp. Butternut Bread Division v. Chauffeurs, Teamsters, Warehousmen and Helpers Local Union No. 135*, 909 F.2d 885 (6th Cir. 1990) ("allowing intoxicated persons to drive motor vehicles violates public policy, it does not follow, however, that any arbitration award reinstating an employee discharged for being intoxicated while off-duty . . . may never be enforced without violating the public policy exception of arbitration awards"), *cert. denied*, 111 S. Ct. 1104 (1991).

Exxon has not identified[9], and this court has not found, a public policy, "well defined and dominant, . . . ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest," *W.R. Grace,* 103 S. Ct. at 2183-84, that is violated by the reinstatement of an employee to a nondriving job for the employee's failure to report an arrest or conviction for DWI.[10]

---

[9]     The fact that Nugent may have violated Exxon's Drug and Alcohol Policy does not in itself establish that his reinstatement would violate a well-defined and dominant public policy.

[10]     In *Gulf Coast*, Exxon discharged Woods for violating its drug policy and failing to report his relapse. 991 F.2d at 247. The court, however, did not emphasize the policy against reinstating an employee who failed to report, but rather the policy against drug use. *Gulf Coast*, 991 F.2d at 250. Further, Woods attempted "to conceal his drug use." *Gulf Coast*, 991 F.2d at 253. In this case, Nugent, unlike Woods, was found to be an "honest and cooperative witness" by the arbitrator and was "honest and forthcoming with management following his . . . confession." (Docket Entry No. 11, p. 33). In his opinion, the arbitrator identified several arbitration cases in which employees were reinstated after reporting violations. In *Freightliner Corporation*, the grievant had been terminated for falsifying his employment application. 94-2 ARB 4433. The grievant had not included juvenile convictions, because he had thought them to be expunged from his record, and a recent DWI, because it was still pending in the courts. The arbitrator ordered the employee reinstated.

Exxon appears to argue that Department of Transportation reporting regulations are part of the national public policy against drug use which would be violated by Nugent's reinstatement. Exxon asserts that "DOT regulations require reporting of all violations of motor vehicle traffic laws and ordinances (other than violations involving only parking)." Docket Entry No. 17, p. 3; *citing* 49 C.F.R. §§ 391.27(a) and 383.31(b) (1994). The DOT regulations provide that:

> [e]ach person who operates a commercial motor vehicle, . . . , and who is convicted of violating, in any type of motor vehicle, a State or local law relating to motor vehicle traffic control . . ., shall notify his/her current employer of such conviction. The notification must be made within 30 days after the date that the person has been convicted.

49 C.F.R. § 383.31(b) (1994); *see also* 49 C.F.R. § 391.27(b) (1994) ("[i]f the driver has not been convicted of . . . any violation which must be listed, he shall so certify."). The regulations cited by Exxon appear in the "Notification Requirements and Employer Responsibilities" subsection regulating the reporting obligations of "operators of common carrier motor vehicles." 49 C.F.R. Part 383- - Commercial Driver's License Standards Subpart C. They do not appear in the section on "Controlled Substances and Alcohol Use Testing." 49 C.F.R. Part 382. While the regulations require notification of arrests and convictions, and may require reassignment of employees who have violated the regulations, they do not require the discharge of operators who fail to comply with the notification requirements.

Part 382 of the DOT regulations addresses alcohol use by motor vehicle operators, 49 C.F.R. § 382.103(a) (1994), and "establish[es] programs designed to help prevent accidents and injuries resulting from the misuse of alcohol or use of controlled substances by drivers of commercial motor vehicles," 49 C.F.R. § 382.101 (1994). The regulations prohibit the on-duty use of alcohol by employees in safety sensitive positions, 49 C.F.R. § 382.205 (1994); the possession of alcohol on-duty, 49 C.F.R. § 382.204 (1994); the reporting for duty with an alcohol concentration of 0.04 or more, 49 C.F.R. § 382.201 (1994); and the performance of safety-sensitive functions within four hours of the consumption of alcohol, 49 C.F.R. § 382.207 (1994).[11] As a "consequence[] for drivers engaging in substance use-related conduct," the DOT regulations prohibit the "perform[ance] of safety-sensitive functions, including driving a commercial motor vehicle." 49 C.F.R. § 382.501(a) (1994). The regulations do not reflect a public policy that would be violated by Nugent's reinstatement to a nondriving job.

If Exxon is persuaded that employees' off-duty and off-premises abuse of alcohol justifies discharge, then Exxon may add this conduct to its list of Posted Offenses. No such Posted Offense existed when Nugent was discharged. The Posted Offenses address habitual drug and alcohol use or drug and alcohol use "on Company time or Company property." (Docket Entry No. 11, p. 100). As noted above, Nugent was not discharged for violating these rules, but for his failure to

---

[11]     Exxon does not allege that Nugent violated any of these DOT regulations.

report his DWI arrest and conviction. Exxon did include in its Posted Offenses failing to comply with federal safety laws or regulations and making dishonest statements, but, as discussed above, the arbitrator found that Nugent had not committed those Posted Offenses.

Exxon argues that "Nugent's off-duty conduct reflects an utter disregard for the safety of the public." (Docket Entry No. 17, p. 4). The policy concern for public safety in this case is met through Nugent's reinstatement to a nondriving job. In *Misco*, the Supreme Court upheld an arbitration award which ordered the reinstatement of an employee discharged for possessing marijuana on company property, in part because the company could reinstate the employee to a position that was not safety-sensitive. 108 S. Ct. at 374. In *Gulf Coast*, the Fifth Circuit emphasized that in *Misco*, the Supreme Court allowed an employee to be reinstated, making "reference to the provision of the award that permitted the company to transfer the grievant to a different but equivalent job, remarking that it was unclear that the worker 'would pose a serious threat to himself and others in every job for which he was qualified.'" 991 F.2d at 254. In *Gulf Coast*, by contrast, "no such discretion exist[ed]; [the employee] was ordered to be returned to his former [safety-sensitive] position." *Gulf Coast*, 991 F.2d at 254. In this case, as in *Misco* and not *Gulf Coast*, the arbitrator gave Exxon the discretion to reinstate Nugent to a non-driving position. This effects the result which Exxon stated it would have reached had Nugent initially reported his DWI conviction.

This discretion alleviates the concern for public safety on which Exxon rests its challenge to the award.

The arbitration award ordering Nugent's reinstatement after his discharge for failing to report his DWI arrest and conviction does not violate a national public policy. Exxon's motion to vacate the award on the basis of public policy is DENIED.

## VI. Conclusion

This court GRANTS Federation's motion to dismiss Sections VIII, IX and X of its counterclaim; DENIES Exxon's motion for a summary judgment vacating the arbitration award; and GRANTS Federation's cross-motion for summary judgment. The parties are ordered to submit a proposed final judgment, consistent with this memorandum, within ten days of the day this order is entered.

SIGNED on _January 22_ , 1997, at Houston, Texas.

Lee H. Rosenthal
United States District Judge